THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BAREND VAN ZANTEN and
CANDACE VAN ZANTEN,

Plaintiffs,

v.

CITY OF OLYMPIA,

Defendant.

CASE NO. C10-5216-JCC

ORDER

This matter comes before the Court on the parties' cross-motions for summary judgment. (Dkt. Nos. 17, 22.) Having considered the parties' briefing and the relevant record, the Court grants Defendant's motion and denies Plaintiffs' motion for the reasons explained herein.

I. **BACKGROUND**

This matter involves a dispute over the drainage of water across Plaintiffs' property in Olympia, Washington. The property, although undeveloped itself, is located within the city limits in a neighborhood that was developed decades ago. The property borders approximately 50 feet of Berry Street to the east, two developed parcels to the north and south, and city property to the west. Plaintiffs' property slopes downward from east to west, and the parties agree that the property serves as a natural drainage area for at least some of the surrounding land. (Dkt. No. 17 at 1; Dkt. No. 22 at 2.) Beyond the city property to the west is East Bay Drive, and beyond that Budd Inlet, part of Puget Sound.

Plaintiffs became interested in the property in 2003 and contacted its owner at the time about purchasing it. Plaintiffs also personally inspected the property at that time. (Dkt. No. 28 at 4.) They executed a purchase and sale agreement in April 2003, agreeing to pay $62,500 for the property. (Dkt. No. 21 at 14.) The agreement included three contingencies, one of which was the "issuance of a building permit to Purchaser's specifications." (*Id.* at 15.) At the time Plaintiffs executed the purchase and sale agreement, they were aware that two culverts direct stormwater under Berry Street from the properties on the eastern side of the street. (Dkt. No. 28 at 4.) The water from the culverts flows westerly across Plaintiffs' property and empties into a catch basin located on the city lot to the west, and from there it is directed under East Bay Drive and discharged into Budd Inlet. The parties do not know whether the culverts were installed by the city or by a private developer, but there is no dispute that they were in place as of 1983. (Dkt. No. 35 at 2, 11.)

After executing the purchase and sale agreement, but before they had closed the sale of the property, Plaintiffs began the process of obtaining a building permit. On April 23, 2003, they met with city officials in a pre-submission conference, which does not "definitively establish the conditions of development," but rather is intended to identify likely requirements for building on a property. (Dkt. No. 18 at 3.) Plaintiffs were told at the conference that the lot was "wet and potentially unstable to build on" given the historical drainage on the property and its position as the low point on the Berry Street grade. (Dkt. No. 18, Ex. 2.) City officials told Plaintiffs that drainage pipes would have to be built to handle the water from the culverts, and that the city would need a 20-foot-wide easement to maintain the pipes. (Dkt. No. 18 at 4; Dkt. No. 28 at 4.) As the property is only 50 feet wide, Plaintiffs determined that they would not be able to develop the property after granting the city a 20-foot easement. They therefore proposed in a letter to city officials that they be allowed to "engineer, install and maintain the proposed storm drain lines" at their own expense and that the city's involvement be limited to reviewing the engineering plans and inspecting the installation. (Dkt. No. 35 at 15.) The city agreed to this request, with the

understanding that Plaintiffs would assume responsibility for maintenance of the drain lines once installed.

Plaintiffs hired an engineer in December 2003 to assist in devising a plan for designing the drain lines. (Dkt. No. 28 at 5.) In September 2005, they submitted the plan to the city Engineering Plans Examiner for approval. (Dkt. No. 18 at 5.) The plan called for routing storm drainage to the north and south boundaries of the property, where it would be collected in "tightline" pipes and directed to the western edge of the property. (Dkt. No. 28 at 5.) From there it would flow in "riprap" rock channels to the catch basin on city property. (*Id.*) The Engineering Plans Examiner requested additional geotechnical reports and proposed several modifications to the plan, including that the water be conveyed to the city catch basin in tightline pipe rather than via riprap channel. (Dkt. No. 18 at 6, Ex. 6; Dkt. No. 28 at 6.) Plaintiffs agreed to those changes and submitted a revised plan on July 3, 2006. The city approved the plan on July 12, 2006. (Dkt. No. 18 at 7.) Plaintiffs began construction of the drainage lines over a year later, in August 2007, and the city approved the construction as complete in September 2007. (*Id.* at 8.) Plaintiffs also closed the sale of the property around this time, over four years after executing the purchase and sale agreement.

In December 2007, during an unusually strong storm, the water flowing through the tightline pipe overflowed the catch basin on city property, caused some erosion of the surrounding soil, and washed down the slope to East Bay Drive. (Dkt. No. 22 at 5.) The Engineering Plans Examiner was notified of the event by an area resident and became concerned that the installed drainage system was inadequate. (Dkt. No. 18 at 9.) He requested that the tightline pipe be replaced with a riprap channel—the initial design proposed by Plaintiffs' engineer. (*Id.*; Dkt. No. 28 at 6.) Plaintiffs agreed to have their engineer develop a plan for the removal of the tightline and installation of a riprap channel. They submitted that plan to the city for review in August 2008, and the city's Stormwater Engineer provided comments on the plan to Plaintiffs on September 3, 2008. (Dkt. No. 18 at 9.) Plaintiffs have decided not to proceed with

implementing the plan unless the city pays for the changes, and the tightline remains in place. After the December 2007 storm, the city replaced the grate covering the catch basin that had overflowed with one designed to permit water to flow through more easily. (*Id.*) No further incidents of overflow have been reported since the grate was replaced.

The parties continued to discuss permitting issues related to the property, and in February 2009, the city official who oversees building projects told Plaintiffs that they could proceed with filing a building permit application regardless of the water drainage issue. (Dkt. No. 35 at 7.) A month later, the same city official informed Plaintiffs that a conventional retaining wall and foundation would be acceptable for the property. (*Id.* at 6.) Plaintiffs were also given permits to proceed with tree removal on the property. (*Id.*)

In December 2009, Plaintiffs sent the city a notice of intent to file suit under the Clean Water Act. (Dkt. No. 32.) Three months later, Plaintiffs filed their Complaint, alleging violations of the Clean Water Act, trespass, nuisance, and arbitrary and capricious conduct. (Dkt. No. 1.) Both parties move for summary judgment on all claims.

## II. DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact finder to find for the nonmoving party. *Id.* at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### A. Clean Water Act

The Clean Water Act (CWA) prohibits the discharge of pollutants into the navigable waters of the United States, with certain statutory exceptions. *See* 33 U.S.C. § 1311(a). One such

exception is for holders of permits issued under the National Pollutant Discharge Elimination System (NPDES). 33 U.S.C. § 1342. The NPDES program is the "centerpiece" of the CWA, and permits issued under the program contain specifically delineated discharge limitations. *Am. Iron & Steel Inst. v. Envtl. Prot. Agency*, 115 F.3d 979, 995 (D.C. Cir. 1997). Essentially, the discharge of any pollutant from a "point source" into navigable waters without an NPDES permit is prohibited. *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063, 1070 (9th Cir. 2011). Regulations promulgated under "Phase II" of the NPDES program require permits for discharges from municipal separate storm sewer systems (MS4s) in small cities. *Id.* at 1082.

The CWA authorizes citizen suits under 33 U.S.C. § 1365 "to enforce water quality standards [and] effectuate complementary provisions of the CWA and the underlying purpose of the statute as a whole." *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 989 (9th Cir. 1995). The statute defines "citizen" as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. 1365(g). The Act does not permit citizen suits for wholly past violations; citizen-plaintiffs must make good faith allegations of continuous or intermittent violations. *Natural Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 998 (9th Cir. 2000).

Plaintiffs argue that the discharge of stormwater onto their property violates various provisions of the NPDES permit issued to the City of Olympia in 2007. Defendant counters that Plaintiffs lack standing to bring a citizen suit under the CWA and that, regardless of their lack of standing, Plaintiffs have failed to show any violation of the Act.

**1. Standing**

Article III of the Constitution establishes the requirements for standing to sue under the CWA. A plaintiff must show (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the action of the defendant; and (3) that it is likely that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Services, Inc.*, 528 U.S. 167, 180-181

(2000). Defendant argues that Plaintiffs show no ongoing injury and that their alleged harm would not be redressed if this suit were successful. (Dkt. No. 17 at 8.) Plaintiffs respond that their inability to use their property for a single-family residence constitutes injury sufficient to confer standing under the statute. (Dkt. No. 22 at 12.)

The Court agrees with Defendant that Plaintiffs have offered no evidence of an "injury in fact" that is "not conjectural or hypothetical" as required under *Laidlaw*. 528 U.S. at 180. First, Plaintiffs concede that they knew when they agreed to purchase the subject property in April 2003 that water from surrounding area drained across the property. Owners of a neighboring parcel spoke of a "stream" running through the property, and the former owner of the subject property informed Plaintiffs about the drainage culverts. (Dkt. No. 21 at 8, 11.) Indeed, the price that Plaintiffs agreed to pay for the property reflected the preexisting drainage issue, and Plaintiffs made the purchase contingent on their ability to obtain a building permit. Plaintiffs proceeded to close on the property in 2007, long after the purchase and sale agreement, and well into their negotiations with the city about how the drainage issue would be addressed. Thus, Plaintiffs have not shown that their interest in the property has been adversely affected by the water draining through the culverts.

Second, the record flatly contradicts Plaintiffs' assertion that they are unable to use the property for a single-family residence. Plaintiffs have not applied for, let alone been denied, a building permit for a residence on the property. In fact, they have been informed by city officials that they may proceed with filing a building permit notwithstanding the water drainage issue, and the city has approved Plaintiffs' applications for permits related to building a home, including the use of a conventional foundation and the removal of trees. Given these undisputed facts, Plaintiffs' alleged injury is at best the kind of conjectural or hypothetical injury that does not meet the requirements of Article III.

Third, Plaintiffs do not allege any interest in the environment or clean water sufficient to establish standing here. The Ninth Circuit has held that a claim under the citizen-suit provision

should "arise from an interest in the environment" and seek to vindicate at least some environmental concerns. *Dan Caputo Co. v. Russian River County Sanitation Dist.*, 749 F.2d 571, 575 (9th Cir. 1984). Here, the allegation that Defendant is discharging pollutants into Budd Inlet is wholly unrelated to Plaintiffs' alleged injury—their inability to develop their property. And Plaintiffs do not argue that their use or enjoyment of Budd Inlet has been impaired by Defendant's actions. Like the plaintiff in *Dan Caputo*, whose alleged injury arose from the reallocation of grant funds, Plaintiffs here do not seek to vindicate environmental concerns. *See id.*; *Gonzales v. Gorsuch*, 688 F.2d 1263, 1268 (9th Cir. 1982) (purpose of citizen-suit provision is "to insure that an interest in the environment and clean water, whether or not economically based, is a sufficient basis for a citizen suit").

In light of these defects, the Court concludes that Plaintiffs have not established standing to sue Defendant for alleged violations of the CWA.

### 2. Violation

Even if Plaintiffs were able to satisfy the standing requirements above, their CWA claim fails on the merits. Interpreting the evidence in the light most favorable to Plaintiffs, there is no genuine issue as to whether Defendant has violated the CWA or the terms of Defendant's NPDES permit.

Plaintiffs allege five violations of Defendant's NPDES permit. First, they claim that Defendant is "collecting, diverting and discharging storm water onto Plaintiffs' property without an agreement from Plaintiffs in violation of Section S3 of the Phase II Permit." (Dkt. No. 22 at 13.) According to Plaintiffs, Defendant has attempted to transfer its own responsibilities under the NPDES permit to Plaintiffs by requiring that they construct a conveyance for the stormwater flowing through the culverts under Berry Street. (Dkt. No. 41 at 19.) Plaintiffs note that the permit does not allow a municipality to require private citizens to fulfill the permit's requirements.

This claim fails for two reasons. The first is that Defendant has not "required" Plaintiffs

to assume its responsibilities under the permit. There is no dispute that Defendant originally offered to build drainage pipes to handle the water from the culverts, but when Plaintiffs determined that the easement necessary to maintain such pipes would likely interfere with their ability to build a home on the property, they requested that they be allowed to construct a drainage system on the property at their own expense. The city granted that request, all of which occurred prior to the issuance of the NPDES permit.

The second reason this claim fails is that Section S3 of the NPDES permit does not address the handling or redirection of stormwater by private citizens. Section S3 merely states that the city is responsible for the MS4 that it owns and operates. (Dkt. No. 20 at 21.) Contrary to Plaintiffs' repeated contentions, the drainage system on their property is not part of the city's permitted MS4. *See* 40 C.F.R. § 122.26(b)(8) (defining MS4 as "a conveyance or system of conveyances . . . owned or operated by a State, city, town . . . or other public body . . . [d]esigned or used for collecting or conveying stormwater"). Nothing in the permit—let alone Section S3—forecloses the construction or maintenance of private stormwater conveyance systems, nor does the permit require the city to ensure that all stormwater remains exclusively in its MS4 prior to discharge. Plaintiffs therefore have not raised a genuine issue of fact as to any violation of Section S3 of the permit.

Plaintiffs' second CWA claim is that Defendant violated Section S4 of the NPDES permit by conveying stormwater onto their property without using best management practices or "all known available and reasonable treatment" (AKART) to reduce the discharge of pollutants to the maximum extent practicable. (Dkt. No. 22 at 13, 15.) But the Washington State Department of Ecology—the administering authority for Defendant's NPDES permit—has determined that for Phase II permitees, "the development, implementation and enforcement of stormwater management programs required under [the] permit" meets the AKART standard and "constitutes the controls necessary to reduce the discharge of pollutants to the maximum extent practicable." (Dkt. No. 20, Ex. 7 at 31-32.) Defendant has submitted unrebutted evidence that it

has adopted a stormwater management plan and that it has complied with the terms of its NPDES permit for implementing that plan. (Dkt. No. 20, Ex. 2.) This is fatal to Plaintiffs' second claimed violation of the CWA.

Plaintiffs' third claim is that Defendant has violated Section S4 of the NPDES permit by "collecting, diverting and discharging storm water to flow from Berry Street and the surrounding areas to Budd Inlet through nonexistent or defective/improperly maintained erosion and sediment controls." (Dkt. No. 1 at 6.) Plaintiffs offer little detail on this claim, other than to state without support that the catch basin located on city property to the west of Plaintiffs' property "is obviously undersized and cannot handle" the amount of stormwater that flows into it. (Dkt. No. 22 at 17.) It is not clear how this allegation, if true, would show a violation of Section S4, which does not address erosion or sediment controls. To the extent that Plaintiffs are arguing that the catch basin contravenes best management practices or AKART, this claim fails for the same reason Plaintiffs' second claim fails: Defendant has adopted and implemented a stormwater management plan that meets the requirements of the NPDES permit. On the other hand, if Plaintiffs are alleging that the overflowing of the catch basin in December 2007 somehow entailed a violation of the terms of the permit, the claim fails for failure to show a continuous or intermittent violation of the CWA. *See Southwest Marine*, 236 F.3d at 998. Either way, this claim cannot survive.

Plaintiffs' fourth claim is that Defendant has discharged water "to Budd Inlet of the Puget Sound with sediment levels in excess of permissible standards in violation of Section S4 of the Phase II Permit." (Dkt. No. 1 at 6.) A plaintiff alleging a violation of water quality standards, however, must proffer at least some data or sampling suggesting excessive effluent levels. *Natural Res. Def. Council v. County of Los Angeles*, --- F.3d ---, 2011 WL 2712963 at *18 (9th Cir. 2011) (affirming summary judgment on claims that city violated NPDES permit by discharging pollutants through its MS4 because plaintiffs failed to "sample from *at least one* outflow that included a standards-exceeding pollutant") (emphasis in original). Here, Plaintiffs

have offered no water quality data whatsoever, much less water quality data showing effluent levels in Budd Inlet in excess of the limitations in the permit. Plaintiffs' therefore have not met their evidentiary burden as to the fourth claim.

Plaintiffs' fifth claim is that Defendant has violated planning, monitoring, and reporting requirements of the NPDES permit. (Dkt. No. 1 at 6.) Plaintiffs have offered no further evidence or argument in support of this claim, which necessarily fails.

In their summary judgment motion, Plaintiffs additionally allege that Defendant has failed to maintain storm water structures or mitigate erosion in violation of General Condition G2 of the NPDES permit. (Dkt. No. 22 at 18.) This allegation was not included in either the Complaint or the Notice of Intent to Sue and is therefore barred. *See* 33 U.S.C. § 1365(b) (no action under citizen-suit provision may be commenced prior to 60 days after notice of the violation has been given). Moreover, this claim is subject to the same defects as Plaintiffs' third claim: the adequacy of Defendant's stormwater management program and Plaintiffs' failure to show an ongoing violation.

For the foregoing reasons, Plaintiffs have not raised a genuine issue as to any of the alleged violations of the Clean Water Act, and summary judgment on the Clean Water Act claim is therefore warranted.

**B. Trespass**

Plaintiffs allege that Defendant is also liable for trespass because the discharge of stormwater through the culverts "is a physical invasion of the property." (Dkt. No. 1 at 7.) Trespass is (1) an invasion of a plaintiff's interest in the exclusive possession of property, (2) committed intentionally, (3) with the knowledge and reasonable foreseeability that the act would disturb the plaintiff's possessory interest, which (4) causes actual and substantial damages. *Bradley v. Am. Smelting & Ref. Co.*, 104 Wash.2d 677, 692-693 (1985). The statute of limitations for a trespass action is three years from the date of the invasion. *Id.* at 693. Defendant argues that Plaintiffs' claim for trespass is barred by the statute of limitations, that Plaintiffs lack

authority to bring an action for trespass because they purchased the property with knowledge of the drainage issue, and that Plaintiffs have not suffered any damages from the discharge of stormwater on their property. (Dkt. No. 17 at 16-19.)

The Court agrees that Plaintiffs' trespass claim is time-barred. The three-year statute of limitations began to run at the time of the installation of the culverts beneath Berry Street. Setting aside the fact that Plaintiffs have proffered no evidence that the City of Olympia actually installed the culverts, there is no dispute that the culverts were in place as of 1983—approximately 27 years before this action was initiated. Plaintiffs argue that the discovery rule applies in this instance, citing *Mayer v. City of Seattle*, 102 Wash. App. 66 (2000). In *Mayer*, the Washington Court of Appeals held that the statute of limitations for the plaintiff's property-related tort claims began to run when the plaintiff became aware that his property was contaminated by dust from a nearby cement plant. *Id.* at 76. At that point, the plaintiff had reason to know that "the value of the property is likely diminished" and that the presence of the dust "would impede his attempts to develop his property." *Id.* Plaintiffs here suggest that their cause of action did not accrue until they were told by their retained hydrogeologist in January 2009 that "water from the entire neighborhood," and not just the immediately surrounding properties, drained through the culverts. (Dkt. No. 41 at 8.) But it is undisputed that Plaintiffs not only knew of the culverts when they agreed to purchase the property but also negotiated a contingency with the seller acknowledging that the water drainage issue could impede their efforts to develop the property. Thus, under the authority Plaintiffs cite, the discovery rule is inapposite here. Moreover, regardless of Plaintiffs' impression of the drainage area associated with the culverts, there is no allegation of any appreciable change in that area since Plaintiffs agreed to purchase the property in 2003. In other words, Plaintiffs have identified no intentional act by Defendant within the limitations period which would raise a genuine issue as to whether the statute of limitations has run.

Even if the trespass claim were not time-barred, Plaintiffs cannot prevail on the claim

because they can establish neither standing nor the requisite damages from the alleged trespass. "Ordinarily, a grantee or purchaser cannot sue for a taking or injury occurring prior to his acquisition of title, but he may sue for any new taking or injury." *Hoover v. Pierce County*, 79 Wash. App. 427, 433 (1995) (citing *State v. Sherrill*, 13 Wash. App. 250, 257 n. 1 (1975). Here, any injury from the drainage of stormwater—including any diminution in the value of the property—occurred well prior to Plaintiffs' acquisition of title. As explained above, Plaintiffs have demonstrated no damages from the discharge of the stormwater, given that they negotiated a purchase price that reflected the drainage issue and that all permit applications associated with their attempts to develop the property to date have been granted. Plaintiffs' trespass claim therefore fails as a matter of law.

Plaintiffs also assert that they are entitled to treble damages under RCW 4.24.630, which applies to liability for intentional trespass. It is not clear from Plaintiffs' submissions whether they intended this as a separate claim. Regardless, claims under the statute are subject to a three-year statute of limitations. *See* RCW 4.16.080(1). Any separate claim by Plaintiffs here is therefore barred as well.

**C.    Nuisance Per Se**

Plaintiffs further allege that the discharge of stormwater onto their property constitutes nuisance per se. (Dkt. No. 1 at 7; Dkt. No. 22 at 19.) Under Washington law, interference with the use and enjoyment of a person's property, if conducted in violation of statutes, regulations, or permits, is nuisance per se. *See Tiegs v. Watts*, 135 Wash. 2d 1, 13 (1998). Plaintiffs' nuisance per se claim is based entirely on Defendant's alleged violation of the Clean Water Act. (*See* Dkt. No. 1 at 7; Dkt. No. 22 at 19-20.) Because Plaintiffs have not raised a genuine issue of fact as to any violation of the Clean Water Act, their nuisance per se claim fails. In any event, the claim is time-barred for the reasons stated above.[1] *See* RCW 4.16.130; *Bradley*, 104 Wash.2d at 684

---

[1] Defendant argues that Plaintiffs' trespass and nuisance claims fail as a matter of law because the city had acquired a prescriptive easement to discharge stormwater onto the subject

(two-year statute of limitations for nuisance actions).

### D. Arbitrary and Capricious Conduct

Plaintiffs' final claim is that Defendant's "cavalier actions" in requiring Plaintiffs to "construct a storm water conveyance system to handle Defendant's MS4 storm water" constituted arbitrary and capricious conduct under RCW 64.40.020. (Dkt. No. 22 at 23-24.) That statute, however, requires that a plaintiff exhaust all administrative remedies before commencing an action. RCW 64.40.030. Plaintiffs have not appealed any decision by the city with regard to their permit applications, and indeed all applications to date have been approved. Because Plaintiffs have neither initiated nor exhausted their administrative remedies, summary judgment must be granted on this claim.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 17) is GRANTED. Plaintiffs' motion for summary judgment (Dkt No. 22) is DENIED.

DATED this 2nd day of November 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

property. As the Court concludes that summary judgment is appropriate on both claims for other reasons, it does not reach Defendant's argument for a prescriptive easement.